United States District Court
Southern District of Ohio
Eastern Division

| | |
|---|---|
| James Williams<br>c/o Laufman Napolitano, LLC<br>4310 Hunt Road<br>Cincinnati, Ohio 45242<br><br>   Plaintiff,<br> v.<br><br>Jon Farrelly<br>c/o Circleville Police Department<br>151 East Franklin Street<br>Circleville, Ohio 43113<br><br>  and<br><br>RJ Martin<br>c/o Circleville Police Department<br>151 East Franklin Street<br>Circleville, Ohio 43113<br><br>  and<br><br>Ryan Mays<br>c/o Circleville Police Department<br>151 East Franklin Street<br>Circleville, Ohio 43113<br><br>   Defendants. | Case No. 2:25-cv-208 |

Complaint with Jury Demand

I. Preliminary Statement

1. This civil rights case challenges an unlawful entry into the home of James Williams ("Mr. Williams"), an excessive use of force against Mr. Williams, along with his wrongful arrest and a malicious prosecution by the Defendants. Mr. Williams brings this action for these violations of his civil rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution pursuant to 42 U.S.C. § 1983.

II. Jurisdiction and Venue

2. The claims in this matter are brought pursuant to 42 U.S.C. § 1983. This Court has jurisdiction to hear this case pursuant to 28 U.S.C. §§ 1331, 1343 (3) and (4).

3. Venue is proper in the United States District Court for the Southern District of Ohio, Eastern Division pursuant to 28 U.S.C. § 1391.

III. Parties

4. James Williams ("Mr. Williams") is a resident of the State of Ohio who, during all relevant times, resided within the Southern District of Ohio.

5. Defendant Jon Farrelly ("Defendant Farrelly") was, during all relevant times, a sergeant with the Circleville Police Department. Defendant Farrelly is sued in his individual capacity for actions taken under color of state law.

6. Defendant RJ Martin ("Defendant Martin") was, during all relevant times, a police officer with the Circleville Police Department. Defendant Martin is sued in his individual capacity for actions taken under color of state law.

7. Defendant Ryan Mays ("Defendant Mays") was, during all relevant times, a police officer with the Circleville Police Department. Defendant Mays is sued in his individual capacity for actions taken under color of state law.

IV. Facts

8. Mr. Williams incorporates all preceding allegations as if fully restated herein, and further alleges as follows:

9. Mr. Williams was, during all relevant times, a 76 year old retiree who had lived with his wife in the City of Circleville for many years.

10. Mr. Williams has an adult stepdaughter who, herself, has two minor children, Mr. Williams's grandchildren.

11. Mr. Williams's stepdaughter and her children had been living in West Virginia for several years prior to the incidents giving rise to this action.

12. On November 11, 2023, officers of the Circleville Police Department ("CPD"), including Defendant Mays, went to Mr. Williams's home to inquire as to the well being of his grandchildren. The officers told Mr. Williams that they had been called by someone purporting to be the father of the children who claimed to live in West Virginia and had not heard from his wife.

13. Mr. Williams told one of the CPD officers that his stepdaughter and the children were not at his home but that they were staying at a domestic violence shelter.

14. The officers thanked Mr. Williams and left his home without incident.

15. On December 6, 2023, a man purporting to be the father of Mr. Williams's grandchildren appeared at the CPD police station and spoke with police officer William Carver.

16. The man presented Officer Carver a document he claimed to be an order from a West Virginia family court directed to Mr. Williams's stepdaughter related to the custody of the grandchildren (the "West Virginia order").

17. The West Virginia order did not purport to order any action by or toward Mr. Williams and, in fact, did not reference Mr. Williams at all.

18. Officer Carver called his supervisor, Defendant Farrelly, to discuss the fact that the West Virginia order was not from an Ohio court.

19. Defendant Farrelly and Officer Carver discussed that the West Virginia order pertaining to Mr. Williams's stepdaughter was not enforceable in Ohio.

20. During all relevant times, Ohio law relating to foreign orders of the type brought to the Defendants in this case, including, *inter alia*, O.R.C. § 3127.35, were not satisfied.

21. Defendant Farrelly directed Officer Carver to attempt to locate the grandchildren's mother.

22. Defendant Farrelly told Officer Carver that he could not serve or otherwise execute the West Virginia order in Ohio.

23. Following his call with Defendant Farrelly, Officer Carver advised the man that he would attempt to locate the mother of the grandchildren but could not act on the West Virginia order.

24. Officer Carver then went to Mr. Williams's home to locate the mother of the grandchildren despite the information received by CPD officers on November 11, 2023, that they were not at Mr. Williams's home but were instead in a domestic violence shelter.

25. When Officer Carver arrived at Mr. Williams's home, Mr. Williams and his wife informed the officer once again that the children and their mother were not present and did not live with them.

26. The Williamses told Officer Carver the mother lived in town and offered to provide them with her address. Officer Carver declined the information, thanked the Williamses for their cooperation, and left without incident.

27. Following the encounter, Officer Carver told Defendant Farrelly that the children and their mother were not present at the Williamses' home and did not reside at the home. Officer Carver also contacted dispatch to obtain the mother's address.

28. Officer Carver concluded his involvement by discussing with Defendant Farrelly once again the fact that they could not serve or take other official action with respect to the West Virginia order.

29. Two days later, on the morning of December 8, 2023, Mr. Williams was alone in his home.

30. On that date, Defendant Farrelly, accompanied by Defendants Martin and Mays (collectively the "Defendants"), arrived at the Williamses home and knocked on the front door.

31. Mr. Williams opened his door to find the Defendants on his doorstep.

32. The Defendants once again questioned Mr. Williams as to whether he knew the location of his stepdaughter and grandchildren.

33. Defendant Farrelly told Mr. Williams that he had the West Virginia order.

34. Mr. Williams told the Officer Defendants that the West Virginia order was not enforceable upon him. The West Virginia order did not purport to order any action by or toward Mr. Williams and, in fact, did not reference Mr. Williams at all.

35. Defendant Farrelly became irate with Mr. Williams, told him that the West Virginia order was enforceable upon him, and that if he knew the location of the children he would be "obstructing justice" or "interfering with custody" if Mr. Williams did not tell Defendant Farrelly where the children "were at."

36. Faced with these threats of arrest and prosecution, Mr. Williams told the Defendants that he did not wish to speak with them and that he needed to speak with a lawyer.

37. Nevertheless, the Defendants persisted in threatening Mr. Williams with arrest and prosecution if he did not continue to speak to them despite telling them he did not wish to do so and wanted to speak with a lawyer.

38. Under this pressure, Mr. Williams told the Defendants that his daughter and grandchildren were in a car going somewhere, but that he did not know where they were going.

39. The Defendants accused Mr. Williams of lying and threatened again to take him to jail.

40. Defendant Farrelly commanded Mr. Williams to produce "an ID," even though Mr. Williams was standing in the door of his home, the Defendants knew his identity, and no Ohio law required him to do so.

41. Defendant Farrelly then asked for Mr. Williams's name and date of birth, which Mr. Williams promptly provided.

42. Defendant Farrelly then asked Mr. Williams to provide his name and date of birth a second time. When he did not do so, Defendant Farrelly told Defendants Martin and Mays to "hook him," *i.e.*, to physically restrain Mr. Williams and place him under arrest.

43. The Defendants shoved Mr. Williams backward from the doorway, forced their way into Mr. Williams's home, grabbed him, and then threw him down. The Defendants used excessive force including grabbing Mr. Williams and kneeling on his body, thereby crushing his shoulders, knees, neck, back, foot, and head before applying handcuffs.

44. The Defendants did not have a warrant to enter the home.

45. The Defendants did not otherwise have probable cause or lawful justification to enter the home.

46. Mr. Williams pleaded with the Defendants that he had done nothing wrong and told them repeatedly they were hurting him.

47. The Defendants nevertheless persisted in their brutish, sadistic, and unconscionable use of excessive force against Mr. Williams within his home.

48. The Defendants did not have justification to use any force against Mr. Williams.

49. All force used against Mr. Williams by the Defendants was excessive, served no legitimate law enforcement purpose, and was used in a wanton, willful, and malicious manner.

50. The Defendants' excessive use of force against Mr. Williams injured his head, face, neck, chest, back, arms, hands, wrists, knees, and feet resulting in extreme pain, suffering, humiliation, and permanent loss.

51. The Defendants placed Mr. Williams under arrest.

52. The Defendants did not have a warrant to arrest Mr. Williams.

53. The Defendants did not otherwise have probable cause or lawful justification to arrest Mr. Williams because he had committed no crimes, and they lacked probable cause to believe that he had done so.

54. The Defendants refused Mr. Williams's request to put on shoes and instead he was made to walk barefoot to the police vehicle and, ultimately, into the jail.

55. After Mr. Williams was confined in a patrol car, the Defendants discussed what crimes to charge. Defendant Farrelly stated that he was going to charge Mr. Williams with obstructing official business, interference with custody, resisting arrest, and failure to disclose personal information.

56. Defendant Farrelly submitted a false post-arrest report in which he wrote that Mr. Williams refused to disclose the location of his daughter and grandchildren and "lied" as to their

whereabouts. Defendant Farrelly also made no reference to Mr. Williams's assertion of his Fifth Amendment right to remain silent and Sixth Amendment right to speak with a lawyer prior to the alleged "lies" and obstructive silence which formed the basis for the charges against him.

57. After Mr. Williams was arrested, Defendant Farrelly told the purported father of his grandchildren that Mr. Williams, "got stupid," and was arrested and charged because, in his words, "play stupid games … win stupid prizes."

58. Defendants did not have probable cause or otherwise lawful justification to charge Mr. Williams with crimes and initiate legal proceedings against him because they lacked probable cause.

59. Defendants charged Mr. Williams with crimes and instituted criminal proceedings against him for an ulterior purpose for which such proceedings were not designed. Defendants admitted charging Mr. Williams punitively at the time of his arrest, stating they did so because, "play stupid games … win stupid prizes."

60. Mr. Williams defended against the charges which were ultimately dismissed.

61. During all relevant times, the Defendants acted with malicious purpose, in bad faith, and/or in wanton or reckless manner.

62. During all relevant times, the Defendants acted under color of state law in their capacities as CPD officers.

63. Mr. Williams suffered damages including, without limitation, physical injury, pain, suffering, emotional distress, embarrassment, humiliation, and deprivation of liberty, as a direct and proximate result of Defendants' actions.

64. All actions described above occurred within the Southern District of Ohio.

V. Cause of Action- 42 U.S.C. § 1983
(*Unlawful Entry*)

65. Mr. Williams incorporates all preceding allegations as if fully restated herein, and further alleges as follows:

66. The Defendants, while acting under color of state law, entered Mr. Williams's home without a warrant, probable cause, or other lawful justification to do so, which deprived him of the rights, privileges, and immunities secured by the Fourth and Fourteenth Amendments to the United States Constitution.

67. The Defendants, while acting under color of state law, denied Mr. Williams his right to Due Process, including the privileges and immunities secured to him by the Fourth and Fourteenth Amendments to the United States Constitution by entering his home without lawful justification to do so.

68. The unconstitutional actions of Defendants as described above, directly and proximately caused Mr. Williams to suffer serious and lasting harm including, without limitation, physical injury, pain, suffering, and emotional distress, which Mr. Williams continues to suffer in the wake of these events.

VI. Cause of Action- 42 U.S.C. § 1983
(*Excessive Force*)

69. Mr. Williams incorporates all preceding allegations as if fully restated herein, and further alleges as follows:

70. The Defendants, while acting under color of state law, subjected Mr. Williams to and/or failed to protect him from excessive force, which deprived him of the rights, privileges, and immunities secured by the Fourth and Fourteenth Amendments to the United States Constitution.

71. The Defendants, while acting under color of state law, denied Mr. Williams his right to Due Process, including the privileges and immunities secured to him by the Fourth and Fourteenth Amendments to the United States Constitution by subjecting him to excessive force.

72. The unconstitutional actions of the Defendants as described above, directly and proximately caused Mr. Williams to suffer serious and lasting harm including, without limitation, physical injury, pain, suffering, and emotional distress, which Mr. Williams continues to suffer in the wake of these events.

## VII. Cause of Action- 42 U.S.C. § 1983
*(Wrongful Arrest)*

73. Mr. Williams incorporates all preceding allegations as if fully restated herein, and further alleges as follows:

74. The Defendants, while acting under color of state law, arrested Mr. Williams without a warrant and otherwise without probable cause to do so.

75. The Defendants, while acting under color of state law, set in motion a legal proceeding against Mr. Williams to accomplish an ulterior purpose for which it was not designed that caused damage to him as a result.

76. The Defendants, while acting under color of state law, set in motion a legal proceeding against Mr. Williams to punish him for asserting his constitutional rights not to speak under the Fifth Amendment and to speak with a lawyer under the Sixth Amendment.

77. The Defendants, while acting under color of state law, otherwise denied Mr. Williams his right to Due Process as secured by the Fourth and Fourteenth Amendments to the United States Constitution by charging him with crimes he did not commit, which they had no probable cause to believe he committed, and which were set in motion to accomplish an ulterior purpose for which those charges were not designed.

78. The unconstitutional actions of the Defendants, as described above, directly and proximately caused Mr. Williams to suffer damages including, without limitation, embarrassment, humiliation, and deprivation of liberty.

## VIII. Cause of Action - 42 U.S.C. § 1983
### (*Malicious Prosecution*)

79. Mr. Williams incorporates all preceding allegations as if fully restated herein, and further alleges as follows:

80. The Defendants, while acting under color of state law, initiated and made, influenced, and/or participated in the decision to prosecute Mr. Williams, with lack of probable cause to do so.

81. The Defendants, while acting under color of state law, initiated and made, influenced, and/or participated in the decision to prosecute Mr. Williams to punish him for asserting his constitutional rights not to speak under the Fifth Amendment and to speak with a lawyer under the Sixth Amendment.

82. Mr. Williams suffered a deprivation of liberty apart from his initial seizure, being taken to jail, processed, and held until his eventual release.

83. Mr. Williams defended against the charges which were dismissed.

84. The Defendants' actions, while acting under color of state law, denied Mr. Williams his right to Due Process as secured by the Fourth and Fourteenth Amendments to the United States Constitution by charging him with crimes he did not commit, which they had no probable cause to believe he committed.

85. The Defendants' unconstitutional actions, as described above, directly and proximately caused Mr. Williams to suffer serious and lasting harm including, without limitation,

physical injury, pain, suffering, embarrassment, humiliation, deprivation of liberty, and emotional distress which Mr. Williams continues to suffer in the wake of these events.

### IX. Prayer for Relief

WHEREFORE, Plaintiff James Williams prays that this Court grant him judgment against the Defendants, jointly and severally, as follows:

1. For compensatory damages in an amount to be shown at trial;

2. For punitive damages in an amount to be shown at trial;

3. For his reasonable attorney's fees and costs under 42 U.S.C. § 1988(b), and;

4. For such additional relief as the Court deems just and proper.

Respectfully submitted,

_____
Gregory A. Napolitano (0068671)
Paul M. Laufman (0066667)
LAUFMAN NAPOLITANO, LLC
4310 Hunt Road
Cincinnati, OH  45242
p (513) 621-4556
f  (513) 621-5563
*gnapolitano@LN-lawfirm.com*
*plaufman@LN-lawfirm.com*
*Counsel for Plaintiff James Williams*

### Jury Demand

Plaintiff hereby demands a jury trial on all issues so triable.

_____
Paul M. Laufman

12